

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00083-CV
_____

IN THE INTEREST OF R.H., Z.K., K.K., AND L.K., CHILDREN

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2018-779-DR

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

In a suit brought by the Texas Department of Family and Protective Services (the Department), the trial court terminated the parental rights of S.K., the mother of four children, R.H., Z.K., K.K., and L.K.,[1] on three grounds specified in the Texas Family Code—Section 161.001, subsections (b)(1)(D), (E), and (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). On appeal, S.K. contends that (1) the evidence was legally and factually insufficient to terminate her rights under subsections D, E, and O and (2) the evidence was legally and factually insufficient to show that termination was in the best interests of the children.

We affirm the trial court's order because the evidence was legally and factually sufficient to show that termination of S.K.'s parental rights was justified under subsections (D) and (E) and that termination was in the children's best interests.

## I.       Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). This Court is required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to

---

[1]To protect the confidentiality of the children involved, we refer to the children, the mother, and her husband by initials. *See* TEX. R. APP. P. 9.8(b)(C)(2).

support the termination of parental rights." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014)). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009))). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *J.P.B.*, 180 S.W.3d at 573).

3

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)))). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). In making this determination, we must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *C.H.*, 89 S.W.3d at 26)).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003))). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26)).

4

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *Id.* at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.))). Even so, in *In re N.G.*, the Texas Supreme Court held that due process demands that we review the evidence supporting findings under grounds D and E when they are challenged on appeal because termination of parental rights under these grounds "may have implications for . . . parental rights to other children." *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019). As a result, we focus our analysis on grounds D and E.

## II. Evidence at Trial

### A. The Children's Condition Under S.K.'s Care

#### 1. C.K.

In 2013, and while S.K. was pregnant with R.H., the Department began investigating S.K. due to her alleged physical neglect of then two-year-old C.K.[2] At the time, S.K. and the children had either been living in a car or they had been living in various residences with unsuitable individuals, and S.K. had been unable to provide food for the child. Rose Chumley, the program director for the Department, stated that, because S.K. needed assistance and guidance, she was given a step-by-step services plan to help her learn how to provide for and take care of C.K.

---

[2]S.K.'s parental rights to C.K. are not at issue in this appeal; however, the facts surrounding her early childhood are relevant to it.

Chumley stated that her first home visit with S.K. took place at a residence in Big Sandy. Chumley described S.K.'s living conditions as "horrible." The house was unsanitary, the yard was overgrown with bushes and trees, there were inoperable vehicles in the yard, and there were numerous cats outside. According to Chumley, the carpet inside the home "was saturated with urine and feces from cats." The furniture was stained, there were multiple cats inside the house, there was cat fur everywhere and dishes and baby bottles all over the counter and the sink, and the baby bottles had green algae inside of them. There were open cereal boxes with cats sitting next to them, a cat in the bassinet, and clothes thrown everywhere in the room. Chumley stated, "It was unlivable for adults but for sure children." Due to the shocking condition of the house, Chumley was forced to leave after being inside the house for only twenty minutes.[3] Sometime after Chumley's visit, C.K. was placed in a parental-child safety placement with fictive kin. S.K. agreed to C.K.'s placement in the home.[4] Eventually, C.K. was permanently placed with a family living in another town.

###  2.  R.H.

During her initial visit with S.K. in Big Sandy, Chumley informed S.K. that she could not bring R.H., as a newborn, into the home in which she was then living. In addition, Chumley made it clear to S.K. that she could not take R.H. to live with S.K.'s mother due to her mother's

---

[3]Chumley explained that she normally would stay for a forty-five-minute assessment.

[4]S.K. claimed that, after R.H. was born, she experienced post-partum depression and that was the reason she had entered into the agreement to give up her rights to C.K. S.K. maintained that she had been given two options by a counselor: either give up C.K. or lose both C.K. and R.H. According to S.K., the counselor gave her that option because "[h]e said [she] wasn't in [her] right state of mind."

methamphetamine addiction. However, according to Chumley, S.K. did not appear to be concerned about her mother's drug use.

Chumley also talked to S.K. about suitable living arrangements in low-income housing, and she reminded S.K. of the services that had already been offered to her regarding housing and welfare assistance. Although S.K. did not respond to Chumley's suggestions, the individuals who lived with S.K. told Chumley that they had found a privately-owned rental property in Gladewater that had to be repainted and that they would be moving into that residence prior to S.K. giving birth to R.H. The private rental property was very close to the Gladewater low-income housing properties, but, according to Chumley, "[S.K.] did not want to hear about living independently. She expressed no interest in filling out housing applications."

R.H. was born in June 2013 and weighed six pounds, three ounces. Prior to her discharge from the hospital, several hospital workers gave S.K. instructions on how to care for R.H. After S.K. and R.H. were released from the hospital, and as planned, S.K. and R.H. moved into the Gladewater rental property with S.K.'s friends. Chumley began making weekly visits to the residence so that she could continue assisting S.K. in caring for R.H.[5] Chumley said that, during the first week of R.H.'s life, S.K. was attentive to his needs and was properly preparing his bottles. Yet, by the second week of his life, R.H. had not gained any weight, and by the third

---

[5]Several other individuals went to S.K.'s home to help her care for R.H. Those individuals, "observed [S.K.] making bottles, feeding R.H., burping him, changing his diapers, [and] bathing him[;] they observed her doing all of those things and giving her certain instructions to do so."

7

week, he weighed less than he did at birth. As a result, when R.H. was almost one month old, he was admitted to the hospital for failure to thrive due to inadequate nutrition.[6]

Dr. Robert Hough, M.D., received R.H., as a failure to thrive patient, after he had been transferred from the hospital where he had been given a bolus of IV fluid. Hough explained that R.H. was malnourished and that "he was below his birth weight even at something, like, twenty-four days old." After he had been hydrated by IV, they monitored his feedings and found that he ate well and was gaining weight. R.H. was released from the hospital after a three-day stay.

Local pediatrician Dr. Steve Womack saw R.H. on an out-patient basis when he was one month old. Womack explained that, although it was normal for children to see a pediatrician at six, nine, twelve, and fifteenth months of age, Womack did not see R.H. for any of those checkups.[7] Womack testified, however, that, by the time he was seventeen months old, R.H. was growing at a normal rate. By 2013, the Department had closed its case involving S.K. and her children.

### 3. Z.K.

Z.K. was born in May 2015. Womack began seeing him at eighteen months of age, which was Z.K.'s first visit to a pediatrician. At eighteen months old, Z.K. had never been vaccinated. Womack explained that, by the time a child turns eighteen months old, he should have been vaccinated against, among others, diphtheria, tetanus, pertussis, haemophilus influenzae B, pneumococcus, measles, varicella, and diphtheria. After his eighteen-month

---

[6]The term "failure to thrive" means that a child is not growing and developing as he should be.

[7]Womack conceded that he did not know if any of the children had been to see another pediatrician.

8

checkup, Z.K. should have seen a doctor for a twenty-four-month checkup and a thirty-month checkup. Z.K. saw the doctor for his thirty-month checkup, but not his twenty-four-month checkup.

### 4. K.K.

K.K. was born in August 2016, and Womack began seeing her when she was about two months old. Womack explained that, in general, children should be seen by a physician "about three to five days after birth, and then again a week later, and then at two months of age." K.K. had a four-month checkup, but she missed her six-, nine-, twelve-, and fifteen-month visits. According to Womack, by that time, L.K. should have had several vaccinations, but she had not. Womack did see K.K. at her eighteen-month checkup and her two-year checkup.

### 5. L.K.

Around January 2018, and prior to L.K.'s birth, S.K. and her children began living with her brother in Gilmer.[8] It was at that time that the Department again became involved with the family due to a report that the house in which they were living had no water or electricity. S.K. denied those allegations. Regardless, the Department began to work with S.K. to attain stable housing for the family and to make sure the children made it to their doctor and dental appointments.

L.K. was born at the beginning of February 2018, weighing six pounds and seven ounces. At her first visit to see Womack, L.K. was three weeks old, and she weighed six pounds, four ounces. On March 1, 2018, when L.K. was about one month old, she weighed six pounds and

---

[8]S.K. denied that she was required to go live with her brother due to the Department's allegation that her mother was using illegal drugs.

seven ounces. In Womack's opinion, L.K.'s increase in weight of only three ounces was "not good." Womack said that, during that visit, S.K. explained that L.K. had been "spitting up quite a bit," which, according to Womack, was not unusual. To help L.K. gain weight, Womack changed her formula.

Around April 5, 2018, S.K. took L.K. back to see Womack because she had continued to spit up, "this time once every bottle, sometimes forcefully." At that point, L.K. weighed six pounds, four ounces. Womack said, "I felt like we definitely -- she had a kind of a wizened appearance and definitely not doing what she should have been doing." As a result, Womack put L.K. on medication for reflux, "which is just severe spitting up to the point it's a disease problem."

Four days later, on April 9, 2018, S.K. went back to see Womack, at which time L.K. weighed six pounds and eight ounces. According to S.K., L.K. was not spitting up as often, but Womack continued her reflux medication. At L.K.'s appointment on April 18, L.K. had lost three ounces, "but [S.K.] stated that the baby had been eating well and just spit up a little bit." Womack explained that L.K. was two and one-half months of age at that time, and she was still not back to her birth weight even though, according to S.K., she was eating well. S.K. told Womack that she was feeding L.K. "four to six ounces every four hours for a total of 30 ounces during the day and was taking a total of nine of those four to 6-ounce bottles in a 24[-]hour period." According to Womack, if L.K. had been taking that much formula, she should have been gaining more weight than she had gained. Womack stated that S.K. did not have any formula the day of her visit, so the nurse offered to give her some. S.K. refused to accept the

10

formula, telling the nurse that "she was giving the baby water." Womack said that L.K. "looked like [she] could be dead in a week." Because Womack believed that L.K. might have had a metabolic problem[9] or some other unusual illness, he admitted her to the hospital.[10]

Seven days later, L.K. weighed seven pounds and ten ounces, which was a weight gain of one pound and five ounces.[11] Womack "could only conclude that" the only difference in L.K.'s care before and after the hospitalization "was a different caretaker."[12] After her release from the hospital, L.K. was removed from S.K.'s care and was placed with a foster family.

## B.    The Children's Placements

### 1.    R.H.'s and Z.K.'s Foster Home

Stacy Wicke became R.H.'s and Z.K.'s foster parent in 2018. When Wicke initially saw the children, they were filthy, and one of them was not wearing shoes. Wicke described the children as looking like "homeless orphans." Both children's teeth were in such horrible

---

[9]L.K. was never tested for metabolic problems.

[10]In addition to Womack's testimony, Dr. Suzanne Gomez-Diaz, M.D., who is also a pediatrician, testified that she was L.K.'s doctor while L.K. was in the hospital for failure to thrive. Gomez-Diaz stated that she had never seen a baby L.K.'s age with such a low weight. While L.K. was in the hospital, Gomez-Diaz said that she gained a significant amount of weight. After ruling out other potential problems, Gomez-Diaz concluded that L.K.'s significantly low weight was due to lack of proper feeding. She also stated that, had L.K. not been admitted to the hospital, "she would have died eventually." According to Gomez-Diaz, she had also seen the other children while she was L.K.'s physician, "and they did not appear to have good hygiene and they had several dental cares." In addition, they were not wearing shoes. Gomez-Diaz was surprised to learn that, in 2013, S.K. had been trained in proper nutrition and feeding. At any rate, she recommended that L.K. be discharged from the hospital and placed into foster care.
   Moreover, L.K.'s primary care pediatrician, Dr. Rebecca Hough, M.D., testified regarding L.K.'s condition after she was released from the hospital. Her testimony corroborated Womack's and Gomez-Diaz's testimony. She also added that, despite the existence of some developmental delays due to their earlier circumstances with S.K., L.K. and K.K. were currently progressing well in foster care.

[11]Wyrick explained that babies that are L.K.'s age usually gain about one ounce per day. After her hospital stay, L.K. had gained about three times the normal weight gain.

[12]Womack stated that he did not "want to demonize [S.K.] because [S.K.] was concerned a lot of the time."

11

condition that it was painful for them to eat food. When Wicke attempted to brush their teeth, the children would cry out, "It hurts." After they were placed with Wicke, the children had to be sedated for dental surgery. Wicke said that, after their surgery, the children saw the dentist once every six months unless there was some sort of unexpected problem.

According to Wicke, when the children first came to live with her, they were "[v]ery subdued, quiet, shy. [They] couldn't understand them at all. It took quite a few weeks for [them] to actually be able to communicate verbally. They did not like bath time at all." The children acted as though they feared running water, like they had not seen it before. According to Wicke, the children had nightmares. She explained that R.H. would come wake her up when he had a nightmare and that, although it happened less frequently, it still happened on occasion. Wicke said that, when they first came to live with her, they hated to eat vegetables, but they loved junk food. Yet, Wicke had slowly incorporated healthy food into their diets. In addition, they began going to speech therapy, and according to Wicke, the therapy had helped them with their speech issues.

When the children were returned to Wicke after being on monitored return with S.K.,[13] their behavior had changed. Wicke explained that R.H. would be very withdrawn and moody and that Z.K. would be very belligerent. Wicke explained that, after Z.K. returned, one evening he "just out of the blue slapped [her] in the face." Wicke reprimanded him, stating, "Z.K., we don't do that." "You don't ever hit anybody, and you don't ever slap, especially slap them in the

---

[13]On September 26, 2019, the children were placed on monitored return and went back to live with S.K. Just a few months later, on February 12, 2020, the Department filed a notice of removal from monitored return, maintaining that S.K. had not complied with temporary orders or the service plan and that her home was "no longer safe for the children to remain."

face." Wicke asked him where he had learned to do that, and Z.K. said he had learned it from S.K.'s husband, D.S.

Wicke stated that, since she has had the children back, she has kept them "[s]uper, super busy," and according to Wicke, they were very happy to be back with her. Wicke said that, when they returned, R.H. said, "Mom, I'm home." Although there were some adjustments to be made after the children were back from monitored return, Wicke said that they had progressed by "open[ing] up a whole lot" and that she believed they were happy living in their home.

Wicke described all of the medical, speech pathology, and physical therapy appointments the children would have in the near future. She also said that, if Z.K. missed his physical therapy appointments following his necessary surgery, he was "just not going to learn how to walk properly again." As for his surgery, Wicke explained, "The longer it's waited, the worse it will be for Z.K."

Wicke stated that she loved the children and that she could not "see them being placed yet somewhere new again." She continued, "They are a part of our family and they are part of our hearts, and I want them to stay with us." Wicke also said that no child should have to experience some of the things Z.K. had been through and that she feared for the children's safety if they were returned to live with S.K. According to Wicke, she wanted to be the person to provide the children with a safe home so that they could grow and progress like normal children. Wicke said that, if she had the opportunity to adopt R.H. and Z.K., she would continue to facilitate a relationship between the boys and their sisters, who had been placed in another foster home.

### 2. L.K.'s and K.K.'s Foster Home

In the spring of 2018, L.K. and K.K. were placed in the home of Michael and Valerie Roberts. Valerie stated that they initially got L.K. immediately after she was released from the hospital. Valerie said, "We were shocked at her appearance." Valerie said that she was so small that she looked like a newborn. She stated that L.K.'s coloring "seemed a little off to [them]." She continued, "[B]abies typically are kind of pink." Valerie also recalled that L.K.'s body was disproportionate in that her head was too big for her body. Valerie stated that L.K. was scared and hungry the night they took her into their care. Valerie said that L.K. did well during her feedings and that she did spit up a little, but it had not been excessive. Valerie said that L.K. began putting on weight and continued to do so. After the Roberts had her for about a month, L.K. began to look better. Valerie stated, "She didn't even look like the same baby." But, as she grew, she began hoarding food. According to Valerie, it took several months for her to be secure in the fact that there would always be food.

According to Valerie, when L.K. resumed living with them after monitored return, she had regressed into the same pattern of behavior of hoarding food. When the Roberts moved into a new home, L.K. was concerned about whether they would still have food. Valerie stated that L.K. had been "getting better," but "concern was still there." In addition, Valerie said that, upon the girl's return, L.K. had ringworm and "she was waking up crying about the Boogie Man very frequently."

By the time of trial, Valerie said that L.K. and K.K. were doing well, but that K.K. continued to have issues regarding S.K.'s husband, D.S. On visitation days, K.K. would tell

14

Valerie that she wanted to see her "old mommy S.K., but [she did not] want to see D.S."  Other than that, both girls have gotten back their personalities since coming back from being with S.K. and D.S., and they were doing well in therapy.  Valerie believed the girls should not be returned to S.K.  Valerie said that, if they were returned to S.K., Valerie would fear for their safety.  Along with her husband, Valerie wanted to provide the girls with a safe and secure life, and it was their intention to adopt them.  Regardless, Valerie said that S.K. "absolutely" loved her children.

Michael Roberts testified primarily about the children's behavior and physical characteristics when they were returned to his house after monitored return with S.K.  Roberts said that they both looked unhealthy and that "their skin was sort of a pale yellow and almost looked thin, almost transparent sort of on the outside."  According to Roberts, he "could see their major sort of blood vessels."  They were dirty and had "very dark circles under their eyes."  Roberts explained that the girls were excited to be home but that, after the initial excitement wore off, "they were just a shell of who they were when they left."  Roberts described them as "almost unrecognizable."

Roberts explained that, prior to monitored return, the girls were "outgoing," "bubbly," and "very playful."  But when they returned, they were not happy, and it appeared that they had not been fed properly. K.K., in particular, "had a very curious fear of being outside.  He said she never verbalized what was wrong but that "her reaction was repeatedly to run back into the garage," where she would play with her toys.  On "countless" occasions, K.K. would be afraid of the "Boogie Man[,]" and when she first returned to the Roberts home, she would have

15

nightmares about the "Boogie Man" "practically every night." On one occasion, Roberts took K.K. outside to walk around the property to show her that there was no "Boogie Man." On another occasion, K.K. ran out of the bathroom, saying, "The Boogie Man's in there." When Roberts asked her who the "Boogie Man" was, she responded, "Daddy D.S."

Roberts also testified that K.K. exhibited abnormal behavior with her doll on a few occasions. Roberts explained that K.K. had been playing when she put her hands around the dolls neck and slammed it on the couch. When Roberts asked K.K. what she was doing to her doll, K.K. answered, "Choking it." Roberts said that K.K. told him that her doll was being bad. K.K. also said that D.S. had choked her.[14] According to Roberts, when the girls came back from monitored return, he found two bruises on the back of K.K.'s jawline "just underneath . . . the neck area." Roberts said that the bruises were pale green and oval in shape. At the time, Roberts told Valerie, "That looks like an adult finger on either side of her neck." Roberts said that they did not question K.K. about it, but instead "left it alone."

Roberts said that he wanted K.K. and L.K. to have a "fair shot at a productive life" so they would grow up to be "proud women." In addition, Roberts said that he intended to adopt both K.K. and L.K. and that it was his hope the girls could continue to have a relationship with their brothers, R.H. and Z.K.

---

[14]Roberts described three different ways in which K.K. had choked her dolls. In addition, a photograph of K.K. was admitted into evidence in which she was holding a string with a pencil attached, which she had used to choke her doll "[b]ecause her baby [was] bad."

16

**C.** **The Department's Intervention and Subsequent Termination of S.K.'s Parental Rights**

In May 2018, due to, among other things, unstable housing, S.K. voluntarily discontinued her parental responsibilities, and the remaining three children were removed from her care.[15] Ultimately, S.K. was required to sign three service plans, and the first one began on June 1, 2018. As a part of that service plan, S.K. was required to find employment, find suitable housing, take parenting classes, get counseling, demonstrate and maintain financial stability, and refrain from committing any criminal act.

On September 26, 2019, the children were placed on monitored return and went back to live with S.K. Yet, just a few months later, on February 12, 2020, the Department filed a notice of removal from monitored return, maintaining that S.K. had not complied with temporary orders or the service plan and that her home was "no longer safe for the children to remain." The court granted the Department's request, and the children were removed from S.K.'s home and placed in foster care.

On October 21, 2020, the court entered its order of termination, terminating S.K.'s parental rights to her children pursuant to Texas Family Code—Section 161.001(b)(1), subsections (D), (E), and (O). *See* TEX. FAM. CODE ANN. § 161(b)(1)(D), (E), (O). This appeal followed.

---

[15]L.K. and K.K. were placed together in a foster home, while. Z.K. and R.H. were placed together in a different foster home.

**III.    The Evidence Was Legally and Factually Sufficient to Support Termination of S.K.'s Parental Rights**

S.K. contends that the evidence was legally and factually insufficient to terminate her parental rights under subsections D, E, and O of Section 161.001 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). We disagree.

**A.    Applicable Law**

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.)). Yet, because the trial court's findings under grounds D and E "may have implications for . . . parental rights to other children," due process demands that we review the trial court's findings under each of those grounds. *N.G.*, 577 S.W.3d at 234.

Termination under ground D is proper when there is clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.). "[S]ubsection (D) permits termination [of parental rights] based on a single act or omission [by the parent]." *In re L.C.*, 145 S.W.3d 790, 797 (Tex. App.—Texarkana 2004, no pet.); *see In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). "Inappropriate, abusive,

18

or unlawful conduct by a parent . . . can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *6 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.). "Endanger" means, for purposes of grounds D and E, "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see L.E.S.*, 471 S.W.3d at 923.

Termination under ground E is proper when there is clear and convincing evidence that the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Ground (E) "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failure to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied). Also, "[t]he conduct to be examined includes what the parent did both before and after the child was born." *Id.* "It is not necessary that the conduct be directed at the child or that the child actually suffer injury." *L.E.S.*, 471 S.W.3d at 923. "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.)). Because they are interrelated, we consolidate our examination of grounds D and E.

19

**B.      Analysis**

The evidence showed that from the time of her first child's birth in 2013, S.K. had neglected her children's physical and emotional needs, including, among other things, failing to find and maintain a stable home for them. This is despite the fact that S.K. had been repeatedly given information and assistance from the Department as to how to find appropriate housing. Most, if not all, of her children had lived in motels and substandard mobile home parks, and while there, they were forced to live with numerous other individuals, including S.K.'s mother, who purportedly had a methamphetamine addiction. The following evidence from the record demonstrates the substandard nature of the children's condition while living with S.K.

**1.      S.K.'s Place of Residence**

In 2018, S.K. began living with her husband, D.S., in a "portable building" that had "big double doors."[16] According to S.K., the building could be "turn[ed] into a house." Yet, at that time, the building did not have air conditioning or running water, and D.S. "was in the process of building the bathroom on." S.K. conceded that that type of housing would not be considered "hazard-free." S.K. maintained, however, that, when the children lived with them, the house was in good condition. According to S.K., she and D.S. bought the boys bunk beds, and K.K. slept on her brother's old twin bed with toddler railings. S.K. maintained that the house stayed clean and that they had food, water, and electricity. S.K. stated that D.S. was handy with home repairs and could run plumbing and electricity and "fix most things." She described the building as "a work in progress."

---

[16]The pair married on June 2, 2019.

Photographs of the house were admitted into evidence. The photographs showed a disorganized, cluttered, one-and-a-half room, barn-like structure that had exposed ceilings and exposed electrical wires. In addition, there was a poor quality or damaged water heater on top of a beam or rafter in the open ceiling. The children's beds were situated at one end of the building. A refrigerator and a commercial-size ladder were placed at the other end. The floor appeared to be plyboard or plywood and had no type of covering.

S.K. conceded that, at least on one occasion, the building had no electrical power. S.K. stated that the power had gone off, not because of lack of funds but "due to a storm that came through." S.K. stated that the building contained a stove and a refrigerator, and she denied that they had ever been repossessed.[17] S.K. said, "I told them to come get it because it kept breaking down, and they wouldn't replace it." According to S.K., they "had a stove being brought to the house and a refrigerator." When necessary, they would store food in D.S.'s grandparent's refrigerator and deep freeze.[18]

Although S.K. conceded that they used space heaters in the building, she denied having any knowledge that L.K. had been burned by one of them. She also denied that the Department workers told her to move the space heaters because they were too close to clothing. Moreover, she would not admit that one of the space heaters had been hung above the children's beds. S.K.

---

[17]According to S.K., they initially rented the stove and the refrigerator from a particular company but were unsatisfied with them. They later rented the appliances from another company, and S.K. said, "They work perfectly fine."

[18]D.S. and S.K. lived on D.S.'s grandparent's property. S.K. said that his grandparents lived "maybe 10 feet away" from their house. According to S.K., D.S.'s grandparent's home was "similar to [their house]." She explained, "They [did] the same thing that we did. They built onto their house, too." D.S.'s grandparents were familiar with the children and would sometimes take care of them.

said, "They told me once to move it, and it was because it was setting on the floor and I moved it to higher ground." She claimed that there had been a fan on K.K.'s bed, not a heater. Yet, the Department introduced into evidence a photograph of L.K. showing a "honeycomb shaped burn" on her buttocks. A photograph of what appeared to be bruises in the middle of her back was also admitted, along with a photograph of old, fading bruises on her buttocks, a fading bruise on her left jaw, and scratches on various parts of her body. Those photographs, as well as several others, were purportedly taken after the children had been with S.K. on monitored return.

S.K. also conceded that, when the children were removed from monitored return with her, they could not plug in the refrigerator because "it got laid on its back[,]" and the stove was returned shortly after the children were taken out of the home. S.K. explained that, around that time, the electricity to the building "was running from [an] electrical pole into [their] house because D.S. was remodeling." She claimed that the hook-up was only necessary so that D.S. could plug in his power tools.

It is clear that the one-and-a-half-room shed in which the children were living was wholly inadequate and unsafe. While S.K. hung curtains to give the family members some "privacy," the photographs revealed that she fell short of her goal. The electricity and water had been turned off at some point, and appliances had been removed from the property on at least one occasion. S.K. even acknowledged that the family's electricity had been provided by running an electrical cord from inside the building to an electrical pole outside of the building. Although S.K. had lived in the building with D.S. for about two years, she described the space as a "work

22

in progress." Yet, the photographs showed exposed electrical wires, space heaters, and a perilously placed water heater in the exposed ceilings.

### 2. D.S.'s Relationship to the Children

S.K. reluctantly conceded that the children had accused her husband of physically abusing them and sexually touching one of them. She explained that none of the children told her that D.S. abused them, but they "supposedly" made outcries to other people. According to S.K., she asked Z.K. about the allegations, but he denied that any abuse had taken place. As a result of the children's outcries, D.S. was not allowed to see the children when S.K. exercised her visitation rights after the monitored return ended. According to S.K., the "children loved [D.S.] to death."

Although S.K. understood the Department's concern about D.S.'s alleged abuse of the children, she said that her future plans were to move forward with her children, with D.S. remaining in the home. S.K. said, "[D.S.] did not do that. He was never alone." S.K. conceded that the type of housing in which they lived, with the open space, would not be a good living environment for a child and his accused abuser. S.K. said that, if she found out that D.S. had sexually abused Z.K., she would "leave him in a heartbeat." S.K. stated, "There's no proof. From my understanding with the video, the video didn't even make sense. I just want Z.K. to tell me if it's true or not. He's been coached so much I don't know what's true anymore." S.K. believed that the Department had been "feeding [Z.K.] lies[.]"

Nevertheless, S.K. stated that D.S. had been nicknamed "the Boogie Man" or "[D.S.] the Wolf Man" when he worked at a warehouse in Mineola, and that everyone in the town referred

23

to him by those names. According to S.K., when they were out in public with the children, people called him "the Boogie Man" or "[D.S.] the Wolf Man." K.K. repeatedly told her foster parents that she was afraid of the "Boogie Man," which K.K. identified as D.S. Moreover, K.K. told her foster parents that D.S. had choked her, and she reenacted the event by choking her own doll in three different ways. Photographs also showed that K.K. had blue marks under her chin and around her neck.

To further inflame the living situation, Z.K. had made an outcry of sexual abuse against D.S. He also told his foster mother that he had learned how to slap people in the face from D.S. Yet, notwithstanding the children's allegations against D.S., S.K. made it clear that she intended to continue living with her four children in the same small portable building with D.S. At the time of the hearing, S.K. and D.S. were still married, S.K. said that she still loved D.S., and D.S. continued to provide S.K. with a place to live and continued to be her source of income.

### 3. The Children's Health and Medical Conditions

Ariel Angel, who was the children's caseworker, testified that she became involved with the family in January 2018 and that S.K.'s care of her children's health and medical conditions was deficient. As a part of her job, Angel was to ensure that S.K. got the children to their dental and medical appointments. According to Angel, S.K. scheduled one dentist appointment, but she never took the children to the appointment. Angel said that throughout the time she worked with

24

S.K., "her housing was unstable." Angel explained that S.K. had lived in a variety of different places, either with other individuals or sometimes in a motel.[19]

Angel also testified that L.K. had what she believed to be ringworm. Ultimately, the ringworm spread to Z.K. Angel impressed on S.K. the urgent need for medical assistance. Yet, when Angel called L.K.'s doctor and asked if L.K. had been in to see him for the ringworm problem, the nurse told her that there was nothing in the chart to indicate that S.K. and L.K. had been there. Further, S.K. was repeatedly advised that her children needed medical and dental care. As with the children's nutritional needs, the Department workers assisted S.K. with making the children's appointments, and they instructed her on how to get them to their

---

[19]S.K. conceded that she had changed residences several times between 2013 and 2018 and that, on many occasions, she had lived with her mother. While S.K. was pregnant with R.H., she lived with her mother for a few months in Hawkins. After she gave birth to R.H., S.K. and R.H. went to live in a shelter in Greenville. Around 2014, they began staying in a Greenville motel "[f]or a little bit" because that was where her mother was working. After moving out of the motel, they went to live with S.K.'s cousin in Longview "[m]aybe a year, year-and-a-half going on two years, I mean." In 2015, R.H., S.K., and her mother went to live with S.K.'s boyfriend in a camper at a RV park in Hawkins. At that point, S.K. became pregnant with Z.K.

By the time S.K. delivered Z.K. in May 2015, S.K., along with both children, moved to an RV park in Tyler to live with her mother and her mother's boyfriend. After a few months in Tyler, S.K. moved to San Augustine with her two children, where they lived with non-relatives, along with some of their children. S.K., R.H., and Z.K. stayed in San Augustine for six months, at which time S.K. had an open case with the Department.

Sometime in 2016, S.K. and her two children moved to Lufkin, where S.K. became pregnant with K.K. Shortly after their stay in Lufkin, they all moved back to San Augustine to live with her mother once again. S.K. gave birth to K.K. in San Augustine. After K.K. was a "few months old," S.K. decided to move her family back to the trailer in Hawkins, where she stayed a few months. After living in Hawkins, S.K. and her children moved to Gilmer and lived in a two-bedroom trailer for about a month. After living in Gilmer, they "moved to Ore City with her cousin, and that's where [she] was sexually assaulted and got pregnant with L.K."

When S.K. was about two or three months into her pregnancy with L.K., S.K. informed her mother of the assault, and S.K. and her children went back to Gilmer and "got [their] old trailer back." S.K. stated that they stayed at the Gilmer residence until she was about eight months' pregnant with L.K., at which time S.K. and her children moved to a house in Big Sandy.

After that, the family went to live with her brother in Gilmer, and the Department became involved again. About a month later, S.K. gave birth to L.K. After L.K.'s birth, S.K. decided to move because she "was tired of babysitting his kids along with having to take care of [her own children]." S.K. then moved into Highway 80 Rescue Mission.

About a month later, L.K. was removed from S.K.'s care. After S.K. left the rescue mission, she went to stay in a Longview hotel with her mother. From there, S.K. and her mother moved to Diana, and while there, they lived with her mother's best friend. On May 29, 2018, S.K. voluntarily discontinued her parental responsibilities, and the remaining three children were removed from her care.

25

appointments. Regardless, she failed on numerous occasions—before, during, and after monitored return—to provide her children with the medical and dental care that they so desperately needed. Nevertheless, Angel believed that S.K. had done her best to raise her children, and she did not question whether S.K. loved her children.

### 4. S.K.'s Mental Health

There was also evidence that S.K. suffered from mental health issues, including visual and auditory hallucinations and bipolar issues. Dan Boyton, a psychologist, testified that, in June 2018, he had an opportunity to do a psychological examination of S.K. According to Boyton, S.K. had informed him that she had been previously diagnosed with bipolar disorder. In addition, she reported to him that she had experienced auditory and visual hallucinations that would "tell her negative things about herself," that she had anxiety, and that she saw dead relatives. Boyton explained that that kind of behavior signaled "a psychotic condition." Moreover, S.K. reported that she was depressed and that the depression "usually stay[ed]."

Boyton testified that S.K. had submitted to several psychological examinations and an I.Q. test. She scored 85 on an I.Q. test, and according to Boyton, her score was below the average range. Boyton explained that one of the examinations resulted in findings that S.K. had several "personality characteristics," including, among others, bipolar personality disorder,[20]

---

[20]Boyton testified that a bipolar personality disorder is characterized by periods of depression and periods of mood elevation. Such a disorder, if left untreated, could result in placing a child in a dangerous situation. Boyton explained, "Well, when you're in a depressed mood, you can stay in bed for long periods and not care for the children. When you're in an elevated mood, you think everything is good regardless of the external environment . . . ." As a result, a child could be living in a very poor environment and lacking in basic necessities, but a person with borderline personality might think the environment is perfectly suitable for the child.

borderline personality disorder,[21] paranoid personality disorder,[22] schizotypal personality disorder,[23] and avoidant personalities.[24] In addition, other examination results showed that S.K. lacked nurturing skills, had difficulty parenting under stress, strongly believed in corporal punishment, and would probably expect more from her children than they were developmentally able to give at a particular age. According to Boyton, individuals with these types of issues will "expect their children to make their life better by providing for them versus them providing for the children."

Boyton also performed a child abuse potential inventory, which predicts a person's capacity to commit child abuse. According to Boyton, S.K. received a high score on that particular test. Boyton clarified, "It doesn't mean she did it, just means she's a high risk for it." Moreover, Boyton stated that, instead of giving honest answers to the questions, S.K. gave what she believed to be socially acceptable answers. Yet even though she was attempting to give socially acceptable answers, she still received a high score on the test. Boyton concluded that S.K. had "a bipolar I disorder, with the most recent episode depressed with psychotic features."

---

[21]According to Boyton, a person with borderline personality disorder feels "misunderstood," and "they have a lot of stormy relationships, and everything always feels better somewhere else." Boyton said a person with borderline personality disorder "is almost impossible to treat but not quite that far." He continued, "They're going to feel like their life is always going [to] be better somewhere else rather than where it is."

[22]Boyton also testified that, basically, a person with paranoia personality disorder is very suspicious of others, and sometimes their suspicions are not based in reality. Boyton said that, when paranoia personality disorder is combined with hallucinations and bipolar disorder, he becomes even more concerned from a psychological standpoint. Children placed in such circumstances are in even greater danger.

[23]According to Boyton, people with schizotypal personality disorder are "very suspicious." He continued, "[T]hey hear things that aren't quite there."

[24]According to Boyton, a person with avoidant personality disorder "feel[s] deeply hurt when criticized. They tend to avoid things rather than just actually do them." Boyton explained that an individual with this personality disorder might avoid addressing a child's allegation that he had been physically abused.

27

He said, "It's very similar to schizophrenia, where it means they have periods where they hallucinate, both, in this case, auditory and visual, lose touch with reality."

Boyton also diagnosed S.K. with a general anxiety disorder. Based on her results, Boyton asked S.K. to see a physician so she could get a mood stabilizer and an antipsychotic. According to Boyton, under those circumstances, if S.K. did not get the treatment she needed, she would continue to have elevated moods, depression, and psychotic behavior. Boyton was of the opinion that it would be a "problem" for S.K. to parent children under the age of five years old and that if she did not see a physician, participate in counseling, and start taking medication, she would be placing her children in a dangerous environment. Boyton also opined that an individual who had family support could lead a productive life if they received treatment, but that they would always need treatment. Although Boyton recommended that S.K. get treatment, S.K. acknowledged that she had not done so.[25] Boyton opined that, without treatment, S.K.'s issues would very likely result in negative or dangerous consequences to her children. S.K.'s inappropriate behavior and acts of omission created an environment that repeatedly endangered the physical and emotional well-being of her children.

## C.    Conclusion

We find that the evidence was legally and factually sufficient to establish that S.K. "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]" and that she "engaged in conduct . . . which endangers the physical or emotional well-being of the child[ren]." TEX. FAM.

---

[25]S.K. conceded that her service plan required her to follow all of Boyton's recommendations, but she claimed that Boyton never told her that she needed to get medical help.

28

CODE ANN. § 161.001(b)(1)(D), (E). Accordingly, we find that the evidence was legally and factually sufficient to support termination of S.K.'s parental rights under subsections D and E of Section 161.001 of the Texas Family Code.[26] Therefore, we overrule S.K.'s first point of error.

## IV. Termination of S.K.'s Parental Rights Was in the Children's Best Interest

In her second point of error, S.K. contends that the evidence was legally and factually insufficient to show that termination of her parental rights was in the best interests of the children. We disagree.

### A. Applicable Law

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of a child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

---

[26]"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *O.R.F.*, 417 S.W.3d at 37 (quoting *A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.)). Because we find that there was legally and factually sufficient evidence under grounds D and E to terminate S.K.'s parental rights, we find it unnecessary to discuss her complaint as it relates to ground O.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see E.N.C.*, 384 S.W.3d at 807; *see also* TEX. FAM. CODE ANN. § 263.307(b). "It is unnecessary to prove all of these factors as a condition precedent to parental-rights termination." *In re C.A.J.*, 459 S.W.3d 175, 183 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 27). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *C.H.*, 89 S.W.3d at 28.

### B. Analysis

As to the first *Holley* factor, there was some evidence that R.H. had more trouble than the other children when he was removed from S.K. and placed in foster care, but there was very little, if any, additional evidence as to the other children's desires. And, despite R.H. having difficulties with the initial removal, when he was returned to his foster home after being with S.K. on monitored return, he told his foster mother that "he was home." Yet, Wicke, Angel, and Valerie said that they believed S.K. loved her children. We find the first *Holley* factor to be neutral.

As to the remaining *Holley* factors, S.K. has had a long history of neglecting her children's physical and emotional well-being. She failed to make sure that the children had proper nutrition, and she also failed to make or keep some of their medical and dental appointments when the children were on monitored return. If those appointments had been annual checkups, her failure would not have been as egregious; however, the children's appointments were related to serious physical issues, which they had incurred when they were with S.K. prior to the children's initial removal.

30

In addition, S.K. had subjected her children to unstable living situations for their entire lives. At the time of trial, she was living with D.S. in an ill-suited and unsafe building that was meant not only to accommodate D.S. and S.K, but also four young children. Considering the building's substandard condition, emotional and psychological issues could, and more than likely have, arisen. Notably, S.K. has made clear that she had no plans in the future to remedy the children's living situation. This is so even though the children had made outcries of physical and sexual abuse against D.S. Further, S.K. had been diagnosed with some severe psychological issues, and she indicated that she had no plans to address those issues. Moreover, there was testimony that, if S.K. left her psychological or emotional concerns untreated, there would be negative consequences to the children.

In contrast, the children's foster parents had, for the first time in the children's lives, provided them with stable and secure homes. The families were seeing to the children's mental, emotional, physical, and health-care needs, and the children were thriving after their initial removal and when they were returned to their foster families after being with S.K. on monitored return. The foster parents intended to continue caring for the children and planned on adopting them. The parents testified that they were willing to do anything within their power to make sure that the children grew up to be productive and well-adjusted individuals.

For those reasons, we find that there was legally and factually sufficient evidence to support the trial court's finding that it was in the children's best interests to terminate S.K.'s parental rights.

We, therefore, overrule her second point of error.

31

## V.    Conclusion

Having found legally and factually sufficient evidence to support the trial court's findings that grounds for termination were present and that termination of S.K.'s parental rights was in the best interests of R.H., Z.K., K.K., and L.K., we affirm the trial court's order.

Ralph K. Burgess
Justice

Date Submitted:    March 17, 2021
Date Decided:      April 30, 2021